This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------------

No. 48
Beck Chevrolet Co., Inc.,
          Appellant,
       v.
General Motors LLC,
          Respondent.

          Russell P. McRory, for appellant.
          James C. McGrath, for respondent.
          Greater New York Automobile Dealers Association; Evans
Chevrolet; New York State Automobile Dealers Association; New
York State Automobile Dealers Association; Alliance of Automobile
Manufacturers et al., amici curiae.

RIVERA, J.:

          The United States Court of Appeals for the Second

Circuit certified to this Court questions requiring our

interpretation of two provisions of New York's Franchised Motor

Vehicle Dealer Act (Dealer Act), codified at Vehicle and Traffic

Law § 460 et seq.  The first question concerns the propriety of a

- 1 -

franchisor sales performance standard that relies on statewide data and some local variances, but fails to account for local brand popularity.  Based on our reformulation of the question, we conclude that use of such a standard to determine compliance with a franchise agreement is unlawful under the Dealer Act.  The second question asks whether a franchisor's unilateral change of a dealer's geographic sales area constitutes a prohibited modification to the franchise.  We conclude that it does not.

I.

The underlying federal action involves a dispute between franchisor and Chevrolet car manufacturer General Motors LLC (GM), and a Westchester County-based franchised motor vehicle dealer, Beck Chevrolet Co., Inc. (Beck).  Beck is a long-time automobile dealership with a Chevrolet franchise dating back to GM's predecessor-in-interest.  During the predecessor's bankruptcy proceeding, Beck entered a Wind-Down agreement to terminate its franchise in exchange for a money payout.  After GM acquired certain of the predecessor's assets, GM rescinded the Wind-Down agreement and entered a Participation Agreement with Beck.  The Participation Agreement, along with Beck's Dealer Sales and Services Agreement with incorporated Standard Provisions (Dealer Agreement), allows Beck to operate as a GM franchise operation.

Under these agreements GM required Beck to achieve a

specified level of sales performance within a geographic location designated by GM, referred to as an Area of Geographic Sales and Service Advantage (AGSSA). The AGSSA consists of U.S. census tracts closest in proximity to the dealer, subject to certain traffic condition adjustments. GM carves out an individual dealer's AGSSA from a geographic sales region known as an Area of Primary Responsibility (APR), which is shared by a group of dealers in the same urban location. Dealers, like Beck, are responsible for the sale and marketing of Chevrolet vehicles and products within their respective AGSSA.

GM measured Beck's sales performance based on a Retail Sales Index (RSI), a methodology commonly employed by vehicle manufacturers in the United States, and applied by GM to all its dealers. The RSI is a percentage determined by a fractional equation, which divides a dealer's actual total retail sales during a particular time period, by the dealer's expected sales. In other words, the mathematical representation of an RSI is actual sales (the numerator) over expected sales (the denominator), multiplied by 100.

Expected sales are determined using a multistep formula, whereby GM determines Chevrolet's statewide market share for a particular type of vehicle segment--for example a mid-sized sedan or pickup truck--then multiplies that number by the total retail motor vehicle registrations in the dealer's AGSSA for that same segment, and repeats the process for each vehicle segment.

The results for each segment are combined to achieve the dealer's total expected sales in its AGSSA. By way of illustration, assume in a given year that Chevrolet has a particular mid-sized sedan model and that the sales of that model represent 12% of all mid-sized sedans sold in New York State (constituting one vehicle segment). Further assume that the number of mid-sized sedan registrations in a dealer's AGSSA is 1500, meaning there are 1500 mid-sized sedans registered in the AGSSA. In that case, 1500 is multiplied by the 12% statewide share, equaling 180 expected sales for this segment. This same mathematical formula is repeated for each segment of vehicles in which Chevrolet competes, meaning in each segment for which Chevrolet has a model that could be sold in New York state. Assume four segments total, and that the formula results in the following expected sales by segment: 180, 120, 75, 25. These are added together for a combined number of 400. The 400 represents the dealer's total expected sales and will be the denominator in the equation used to determine the dealer's RSI.

As stated, GM includes in the dealer's expected sales only registrations for vehicle segments in which Chevrolet competes, and does not include registrations for non-Chevrolet vehicle segments. Through this segmentation or "segment-adjustment" GM accounts for local popularity of particular types of vehicles. For example, if pickup trucks are less popular in a given AGGSA, compared to the rest of the state,

a dealer's expected sales are adjusted downward.

A 100 RSI constitutes satisfactory performance of a dealer's sales obligations under the Dealer Agreement. Nevertheless, GM treats this not as a perfect score but as an average score, and as explained in the Dealer Agreement, GM expects dealers below 100 "to pursue available sales opportunities exceeding this standard." GM's Dealer Rating System classifies dealers as follows: "Superior" for a 100 or greater RSI, and the dealer is in the top 15% of all dealers in the state; "Satisfactory" for a 100 RSI and the dealer is not in the top 15%; "Needs Improvement" for a 85 to 99.9 RSI; "Needs Significant Improvement" for an 84.9 or lower RSI and the dealer is not in the bottom 15% of dealers in the state; and "Unsatisfactory" for an 84.9 or less RSI and the dealer is in the bottom 15%.

Applying this rating system to the hypothetical dealer in the prior example, if the dealer sells 400 Chevrolet cars, because its expected sales were also 400, the dealer's RSI is 100 (400 divided by 400 equals 1, multiplied by 100 to achieve an RSI as a percentage). Since the dealer achieved its target sales, which constitutes an average sales performance, the dealer would be rated "superior" if the dealer is in the top 15% of all dealers statewide, or "satisfactory" if the dealer is not in the top 15%. If the dealer with the same expected sales of 400 sells instead 200 Chevrolets, then its RSI is 50 (200 divided by 400,

equals .5, multiplied by 100 to achieve an RSI as a percentage). The dealer achieved only half of its target sales, and would be rated as "needs significant improvement" if the dealer is not in the bottom 15% of all dealers, or "unsatisfactory" if the dealer is in the bottom 15%.

Unless all dealers meet or exceed their expected target sales, there will be some dealers who score below 100. A below 100 score is below average performance. Since the expected sales number is based on an adjusted state market average, as the number of sales increases, so do the number of actual sales necessary to achieve a 100 RSI. In other words, the RSI sales performance measure moves upward (or downward) depending on market variations. Consequently, a dealer's performance is dependent on the performance in the market against which the dealer is measured, and the statewide market is subject to local variations, only one of which is reflected in the RSI (vehicle segment preference).

Under the Participation Agreement, GM required Beck to trend-up to the 100 RSI average benchmark within three years. In the first year Beck had to attain an RSI of 70, in the second year an 85 RSI, and a 100 RSI in its third year. When Beck failed to timely achieve these RSI scores it defaulted on the Participation Agreement, and potentially became subject to a "needs significant improvement" or "unsatisfactory" dealer rating.

In the middle of the second year, GM notified Beck that it would extend the dealer agreement into future years on condition that Beck met its performance requirements, including achieving the 85 RSI by the second year's end, and the 100 RSI in the third year. Failure to achieve the 85 RSI in the second year meant that "GM shall have no obligation to extend the Dealer Agreement." By separate letter GM also informed Beck that it was increasing its AGSSA by four census tracts in Westchester County, and reducing the AGSSA by seven tracts in Bronx County.

After Beck sued GM in State court alleging violations of the Dealer Act based on the performance standard and changes in the AGSSA, GM removed the action to the United States District Court for the Southern District of New York. After procedural history not relevant to the questions certified to us, Beck filed a second amended complaint asserting, inter alia, two Dealer Act claims for injunctive and declaratory relief. The first claim alleged that GM used an unreasonable, arbitrary and unfair performance standard in determining Beck's compliance with its agreements, pursuant to VTL § 463 (2) (gg), and sought to enjoin GM from using a New York statewide average to calculate Beck's sales performance. Beck claimed the RSI was unreasonable and unfair as a matter of law because it failed to account for local customer preferences and low brand popularity in New York's downstate region. The second claim alleged that GM's unilateral change to Beck's AGSSA was an unfair modification within the

meaning of VTL § 463 (2) (ff), because the new area enlarged Beck's sales territory, with the effect of increasing Beck's sales targets and facility requirements.

The district court held against Beck on both claims, and Beck appealed. The Second Circuit determined that resolution of the appeal depended on unsettled New York law, and certified two questions concerning the propriety of GM's performance standard and unilateral modification under the Dealer Act (787 F3d 663 [2d Cir 2015]). The first certified question as framed by the Second Circuit asks

> "Is a performance standard that requires 'average' performance based on statewide sales data in order for an automobile dealer to retain its dealership 'unreasonable, arbitrary or unfair' under New York Vehicle & Traffic Law section 463 (2) (gg) because it does not account for local variations beyond adjusting for the local popularity of general vehicle types?"

The second certified question concerns GM's revision of Beck's AGSSA, and asks

> "Does a change to a franchisee's Area of Primary Responsibility or AGSSA constitute a prohibited 'modification' to the franchise under section 463 (2) (ff), even though the standard terms of the Dealer Agreement reserve the franchisor's right to alter the Area of Primary Responsibility or AGSSA in its sole discretion?"

## II.

### A. FIRST CERTIFIED QUESTION

As a threshold matter we consider GM's recommendation

that we reformulate the first certified question because it is predicated on the incorrect presumption that GM terminates all dealers who have a below-average sales performance, when, in fact, GM bases termination on the RSI and other relevant factors. Beck objects to the proposed reframing of the question, arguing that the consequences that flow from the application of a manufacturer's sales performance metric are relevant to the statute's interpretation, and that Beck was threatened with nonrenewal of its franchise solely because of its RSI score.

We agree with the parties that the question certified by the Second Circuit posits a case in which below-average sales performance results in termination of a dealership. Section 463 (2)(gg), in contrast, makes no mention of termination, and instead applies to standards used to assess dealer compliance with a franchise agreement. Such assessment may lead to franchisor conduct short of termination, but which nonetheless adversely impacts a dealer.

We do not adopt the approach taken by our dissenting colleague to the first certified question because whether a franchisor's standard complies with VTL § 463(2)(gg) is in the first instance a legal question concerning the propriety of the general criteria by which a dealer is measured. Contrary to the dissent's view of the statute, a standard can appear facially unreasonable, arbitrary or unfair, without reference to facts particular to any individual dealer. While a standard that

appears fair as written may be applied in an unfair manner, and a standard that is reasonable in the abstract may have irrational consequences in practice, resolution of the reframed question does not require the type of as-applied analysis advocated by the dissent.  Instead, we consider the standard's lawfulness against benchmarks as framed by GM, which rely on general data and not an individual dealer's facts.

Therefore, to provide appropriate guidance on the statute's anticipated coverage, and in accordance with our discretion in these matters, we proceed to answer the following reformulated question,

> Is a performance standard that uses "average" performance based on statewide sales data in order to determine an automobile dealer's compliance with a franchise agreement "unreasonable, arbitrary, or unfair" under New York Vehicle & Traffic Law section 463(2)(gg) because it does not account for local variations beyond adjusting for the local popularity of general vehicle types?

(see Barenboim v Starbucks Corp., 21 NY3d 460, 469 [2013] [reformulating the certified question to track the language of the statute at issue]; Commodity Futures Trading Comm'n v Walsh, 17 NY3d 162, 177-178 [2011] [reformulating a certified question]).

As our well-established rules of statutory construction direct, we begin our analysis with the language of the statute, recognizing that "our primary consideration is to ascertain and give effect to the intention of the Legislature" (People v

Ballman, 15 NY3d 68, 72 [2010], quoting Matter of DaimlerChrysler
Corp. v Spitzer, 7 NY3d 653, 660 [2006][internal quotation marks
and citation omitted]).  In this endeavor we are guided by the
principle that "the text of a provision 'is the clearest
indicator of legislative intent and courts should construe
unambiguous language to give effect to its plain meaning' "
(Albany Law School v New York State Off. of Mental Retardation
and Dev. Disabilities, 19 NY3d 106, 120 [2012], quoting Matter of
DaimlerChrysler Corp., 7 NY3d at 660).

As its title makes clear, section 463 of the Dealer Act
protects dealers from "Unfair business practices by franchisors."
Section 463 (2) (gg) provides that,

> "[i]t shall be unlawful for any franchisor,
> notwithstanding the terms of any franchise
> contract: . . . [t]o use an unreasonable,
> arbitrary or unfair sales or other
> performance standard in determining a
> franchised motor vehicle dealer's compliance
> with a franchise agreement. Before applying
> any sales, service or other performance
> standard to a franchised motor vehicle
> dealer, a franchisor shall communicate the
> performance standard in writing in a clear
> and concise manner."

(VTL § 463 [2] [gg]).

The Dealer Act does not define what constitutes
"unreasonable, arbitrary or unfair" performance standards.
However, these determinates of impermissible conduct are familiar
concepts in the law (see Black's Law Dictionary [10th ed. 2014]
[unreasonable: "Not guided by reason; irrational or capricious";
arbitrary: "founded on prejudice or preference rather than on

reason or fact"; unfair: "Inequitable in business dealings"]).
Notably, a standard need only violate one of these proscriptions
to run afoul of VTL § 463 (2) (gg). As a consequence, the
statute limits a range of performance standards made unlawful by
the Dealer Act.

Whether a performance standard is "unreasonable,
arbitrary or unfair" depends on considerations unique to the
franchise business, which is driven by sales in a competitive
market. A performance standard that measures dealer success
based on data that fails to accurately represent market
challenges would appear to undermine the franchisor and dealer's
common goal of selling and servicing vehicles and franchisor
products. At a minimum, VTL § 463 (2) (gg) forbids the use of
standards not based in fact or responsive to market forces
because performance benchmarks that reflect a market different
from the dealer's sales area cannot be reasonable or fair.

The standard employed here reflects GM's acceptance
that market forces matter in assessing dealer sales performance.
The RSI is based on an equation in which the market--actual and
aspirational--sets the foundation for measuring a dealer's
achievement. As GM's standard recognizes, a dealer works within
a constructed market--one set both by externalities and by GM's
business needs. Thus, GM measures a dealer's sales performance
by comparison to a statewide class of dealers, but adjusts the
standard to reflect certain local market peculiarities with

respect to one metric: local consumer purchasing preferences for certain vehicle types.  Although having made the determination to incorporate local concerns in its dealer performance standard, GM has also specifically chosen to exclude from its measure the impact of customer brand preference on dealership sales.  Yet, customer purchases are influenced not solely by preferences for a type of vehicle, for which GM accounts through its segmentation formula, but also by brand popularity and import bias.  Moreover, those dealers, like Beck, who service an assigned area in which Chevrolet is less popular are disadvantaged when measured against dealers in other parts of the state in which the Chevrolet brand is stronger and facilitates dealer sales performance.  Therefore, once GM determined that statewide raw data must be adjusted to account for customer preference as a measure of dealer sales performance, GM's exclusion of local brand popularity or import bias rendered the standard unreasonable and unfair because these preference factors constitute market challenges that impact a dealer's sales performance differently across the state.  It is unlawful under section 463 (2) (gg) to measure a dealer's sales performance by a standard that fails to consider the desirability of the Chevrolet brand itself as a measure of a dealer's effort and sales ability.

GM contends that inclusion of these factors is both undesirable and unduly burdensome.  GM essentially argues that it can set a standard that misrepresents external market forces.

However, measuring the dealer's performance against a market the dealer never faces is not reasonable or fair within the meaning of section 463 (2) (gg).  It is the equivalent of holding a dealer in New York State to a standard based on the market of a foreign country or another state without appropriate adjustments for local differences.  In both cases, the dealer is measured against a sales landscape that is not within the dealer's experience.

GM claims that the standard has a certain utility because it is intended to identify dealers in need of improvement.  This boils down to GM desiring to rid itself of ineffective dealers in order to increase its brand market share.  Certainly a franchisor has a business interest in addressing weaknesses in its sales force.  However, in doing so, a franchisor must not deploy unreasonable, arbitrary or unfair performance standards.  The standard used by GM excludes local variance in market competitiveness, and masks the dealer mediocrity of which GM complains.  To comply with the Dealer Act, if a franchisor intends to measure a dealer's performance based on a comparison to statewide data for other dealers, then the comparison data must take into account the market-based challenges that affect dealer success.  Here, if Beck cannot keep up with comparably placed dealers in its sales area, then termination may be appropriate, but as it stands the RSI excludes an important measure of comparability.

Notwithstanding GM's claim that the RSI methodology is consistent with industry norms, it remains the case that any performance standard adopted by a franchisor to determine a dealer's compliance with a franchise agreement is subject to the limitations set forth in the Dealer Act.  While we recognize that industry norms are important because they express the wisdom borne of experience, and reflect considered thought on the part of industry members, they are not beyond the reach of the statute.  We are especially cautious in this regard because this is an industry in which the parties hold unequal bargaining positions, and an industry standard may reflect the entrenchment of the very inequality and favoritism that the Legislature sought to counterbalance in the Dealer Act.  Thus, GM may not rely on a standard that is unreasonable and unfair simply because of its prevalence within an industry the Legislature  sought to regulate.

Relatedly, assuming arguendo that the use of statewide data reflects a certain administrative convenience, the standard would still be unlawful because although it might not be unreasonable or arbitrary, it is still unfair.  Moreover, section 463 (2) (gg) prohibits unfair practices in order to protect dealers, not to alleviate a franchisor's potential administrative burdens associated with its performance standards.

Our analysis also furthers the Act's statutory purpose. By enacting the Dealer Act, the Legislature sought to address a

historical inequality in the vehicle franchise business that
favored automobile manufacturers over motor vehicle dealers
(Assembly Mem in Support of Legislation, Bill Jacket, L. 1983,
ch. 815, § 1, at 7; see New Motor Vehicle Bd. of Cal. v Orrin W.
Fox Co., 439 US 96, 100-101 n 4 [1978], quoting S.Rep. No. 2073,
84th Cong., 2d Sess., 2 [1956] [US Senate finding that the
"highly concentrated" automobile industry created a "vast
disparity in economic power and bargaining strength" between
automobile manufacturers and their dealers, in which
manufacturers "determine arbitrarily the rules by which the two
parties conduct their business affairs"]; see also Automobile
Dealers' Day in Court Act, 15 USC §§ 1221-1225).  The imbalance
placed dealers at the mercy of manufacturers who were able to
draft and impose protectionist agreements favorable to
manufacturers, placing at risk a dealer's financial investment
(see Assembly Mem in Support, at 7).  As the Memorandum in
Support of Legislation explained,

> "[t]here is a great disparity in bargaining
> power between the motor vehicle manufacturer
> and the motor vehicle dealer. The franchise
> agreements which have been developed over a
> long course of dealing between the
> manufacturer and the dealer have reached a
> point where the dealer has few if any rights
> in comparison to those of the motor vehicle
> manufacturer. This results in an undue
> imbalance in bargaining power and the dealer
> is in many cases at the mercy of the
> manufacturer. In reality, the motor vehicle
> dealer who frequently has millions of dollars
> invested in dealership real property,

> equipment and good will can do nothing to
> oppose the will of the manufacturer without
> jeopardizing this substantial investment.
> This bill seeks to provide certain basic
> protection for the dealer in areas where such
> protection is deemed necessary. If enacted,
> the protection afforded the dealer through
> the terms of the bill would counterbalance
> the numerous protections afforded the
> manufacturer under the terms of its franchise
> agreement with the dealer. The result would
> be a healthier marketplace for all parties
> concerned"

(id at 7; see New Motor Vehicle Bd. of Cal., 439 US at 100–101 n

4 [manufacturer's arbitrary "rules are incorporated in the sales

agreement or franchise which the manufacturer has prepared for

the dealer's signature"]).  The legislature expanded protections

for dealers by enacting the Dealer Act in derogation of common

law contract rules, statutorily overriding agreement provisions

that were unfair to dealers (see VTL § 463 [2] [making the 2008

amendments applicable "notwithstanding the terms of any franchise

contract"]).  The legislature thereby sought to affirmatively

"establish an equilibrium of bargaining power" (L. 1983, ch. 815,

at 7).  Furthermore, by amending the statute to include section

463 (2) (gg), thereby imposing a writing requirement to ensure

transparency and a substantive measure of lawfulness, the

legislature identified the misuse of performance standards as one

unfair business practice that needed to be reined in.

Our interpretation of VTL § 463 (2) (gg) should not be

understood as an invitation for a court to substitute its opinion

for a franchisor's determination of how best to achieve its

bottom-line business goals.  Decisions about how best to improve the quality of dealerships and increase dealer sales involve business judgments rightly left to franchisors, and not the courts.  Nevertheless, the legislature, by its enactment of the Dealer Act, has determined it is in the interest of the state to subject a franchisor's performance standards to statutory limits in order to prevent unfair business practices, and has seen fit to place review of franchisor standards squarely within the authority of the courts.

## B.   SECOND CERTIFIED QUESTION

The second certified question concerns GM's revision of Beck's AGSSA, and asks

> "Does a change to a franchisee's Area of
> Primary Responsibility or AGSSA constitute a
> prohibited 'modification' to the franchise
> under section 463 (2) (ff), even though the
> standard terms of the Dealer Agreement
> reserve the franchisor's right to alter the
> Area of Primary Responsibility or AGSSA in
> its sole discretion?"

We conclude that such change is not an impermissible modification within the meaning of the statute.

Under VTL § 463 (2) (ff) (1), "it shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract . . . . [t]o modify the franchise of any franchised motor vehicle dealer, unless the franchisor notifies the . . . dealer in writing . . . at least ninety days before the effective date, stating the specific grounds for such modification."  A "modification" is "any change or replacement of any franchise if

such change or replacement may substantially and adversely affect the new motor vehicle dealer's rights, obligations, investment or return on investment" (id. § 463 [2] [ff] [2]).  A franchise is statutorily defined as

> "a written arrangement for a definite or
> indefinite period in which a manufacturer or
> distributor grants to a franchised motor
> vehicle dealer a license to use a trade name,
> service mark or related characteristics and
> in which there is a community of interest in
> the marketing of motor vehicles or services
> related thereto"

(VTL § 462 [6]).  Thus, a modification is not limited to a change in the franchise contract because other documents may be constituent parts of the parties' written arrangement, reflecting their shared interest in the sales and servicing of vehicles and other franchisor products.

The statute provides the dealer with a private right of action to challenge a modification, and places on a franchisor "the burden of proving that such modification is fair and not prohibited" (VTL §§ 463 [2] [ff] [3]; 469).  Under the statute "[a] modification is deemed unfair if it is not undertaken in good faith; is not undertaken for good cause; or would adversely and substantially alter the rights, obligations, investment or return on investment of the franchised motor vehicle dealer under an existing franchise agreement" (id. § 463 [2] [ff] [3]).

To the extent section 463 (2) makes unlawful certain franchisor abuses, "notwithstanding the terms of any franchise contract," this section abrogates contract principles which

traditionally bind parties to their agreements (see B & F Bldg.
Corp. v Liebig, 76 NY2d 689, 693 [1990] ["The Legislature is
presumed . . . to have abrogated the common law only to the
extent that the clear import of the language of the statute
requires"]).  As a consequence, a franchisor may not insulate
itself from the requirements and proscriptions of section 463 (2)
(ff) by contractually reserving in the standard Dealer Agreement
the power to revise an AGSSA, as GM did in this case.  Otherwise,
a franchisor with superior bargaining power could easily
circumvent the purpose of the Dealer Act by reserving the right
to change franchise terms at will, even where a change results in
significant adverse affects on the dealer.

          The fact that the Dealer Agreement does not contain
details about the AGSSA does not remove a franchisor's revision
of the AGSSA from the ambit of section 463 (2) (ff) because a
change in the AGSSA is a change to the franchise.  The AGSSA is a
subset of a dealer's APR, which is specifically referenced in the
Dealer Agreement.  The AGSSA defines the dealer's geographic
sales area and serves as an essential metric of a dealer's sales
performance.  As such it affects a dealer's competitive position
and ability to comply with its obligation under the Dealer
Agreement to "effectively sell[], servic[e] and otherwise
represent[] General Motors Products" in the dealer's designated
APR.  In other words, a revised AGSSA has the potential to
significantly impact the franchise arrangement.  GM recognized

this very fact in its letter to Beck informing it of the revisions to its AGSSA, which GM described as a notice "provided pursuant to New York Vehicle & Traffic Law § 463(2)(ff)(1)."

However, by its terms, section 463 (2) (ff) (1) is concerned only with those modifications that result in negative consequences for the dealer, and which meet its requirements for determining whether a change is statutorily impermissible. Thus, the only prohibited modification is one that "may substantially and adversely affect the new motor vehicle dealer's rights, obligations, investment or return on investment." In addition, the modification must be deemed unfair, meaning "it is not undertaken in good faith; is not undertaken for good cause; or would adversely and substantially alter the rights, obligations, investment or return on investment of the franchised motor vehicle dealer under an existing franchise agreement" (VTL § 463 [2] [ff] [3]).

Given this statutory language, we cannot say that a revision to a dealer's geographic sales area categorically violates section 463 (2) (ff). The revised area may not have a substantial impact or be adverse to a dealer's interests within the meaning of the statute. Indeed, a change could improve a dealer's sales performance opportunities and competitive position, for example by assigning a geographic area with greater sales potential, by reducing the dealer's geographic area thereby improving the dealer's RSI, or by leveling the playing field

among dealers within the same dealer network.  Thus, a revision of the AGSSA is not perforce violative of section 463 (2) (ff).  Rather, such change must be assessed on a case-by-case basis, upon consideration of the impact of the revision on a dealer's position.

Accordingly, the first certified question, as reformulated, should be answered in accordance with this opinion and the second certified question answered in the negative.

Beck Chevrolet Co., Inc. v General Motors, LLC

No. 48

PIGOTT, J.(dissenting, in part):

Vehicle and Traffic Law § 463 (2) (gg) makes it unlawful for any franchisor, regardless of the terms of a franchise contract, "[t]o use an unreasonable, arbitrary or unfair sales or performance standard in determining a franchised motor vehicle dealer's compliance with a franchise agreement." [1] These general and amorphous adjectives "unreasonable," "arbitrary" and "unfair" are similar to those found in the Uniform Commercial Code and lend themselves to varying interpretations depending on the circumstances of a particular business situation. A performance standard that may be "unreasonable, arbitrary or unfair" as applied to one dealer, in a metropolitan area, may be perfectly reasonable when applied to another in another area of the state. Because in my view a determination concerning the reasonableness, arbitrariness or unfairness of a particular sales performance standard necessarily requires a factual, rather than a legal, determination, I dissent from the majority's response to the first certified question.

District Court conducted a bench trial over several

_____

[1] Beck does not claim that GM failed to "communicate the performance standard in writing in a clear and concise manner," which is also required by section 463 (2) (gg).

days and rendered a determination that the RSI performance standard, which uses a statewide sales average adjusted for local conditions, was not unreasonable, arbitrary or unfair.  In making that determination, District Court considered and rejected the testimony of Beck's expert that the standard did not account for brand popularity and import bias, holding that the Retail Sales Index's (RSI) use of "segmentation" adequately accounted for those particular variables.  Crediting the testimony of GM's two experts, District Court also determined that the RSI standard was "administratively convenient," "objective," and "uniformly applied."  That factual determination concerning the performance standard should not be disturbed unless there is no record evidence to support it.

The majority reaches a different factual conclusion, however, stating that "GM's exclusion of local brand popularity or import bias rendered the [RSI] standard unreasonable and unfair because these preference factors constitute market challenges that impact a dealer's sales performance differently across the state" (majority op, at 12-13).  Putting aside that what constitutes an "unreasonable," "arbitrary" or "unfair" standard is a factual determination, I do not believe it is this Court's role or function to determine, as a matter of law, that GM's failure to include these particular "preference factors" as part of its currently-formulated RSI violated section 463 (2) (gg).  We should be mindful that our decision will apply not only

to the particular facts in this case, but to all automobile manufacturers and dealerships in this state.  Indeed, the Second Circuit acknowledges that GM's performance standards "appear to represent the industry standard" (787 F3d 663, 676 [2d Cir 2015]).

Contrary to the majority's subjective conclusion, GM's use of the RSI with a segmented adjustment does not amount "to GM desiring to rid itself of ineffective dealers in order to increase its brand market share" (majority op, 13) -- a fact that we are not empowered to determine.  However, if that were GM's true motive, it would have stuck with the Wind-Down Agreement that Beck signed instead of entering into the Participation Agreement with Beck instead.  Nor would GM have continued working with Beck from 2010 through 2012 to improve Beck's performance had it been GM's intention that the Beck dealership fail.  It is evident from the record that the RSI is a tool utilized by GM to determine if a franchisee is achieving certain benchmarks, and, if not, the RSI operates as a canary in the coal mine to alert GM that the franchisee needs assistance.

In my view, the majority's opinion sets a standard that will require other franchisors to follow suit, and, to that extent, its interpretation of section 263 (2) (gg) goes beyond what the legislature intended.  Therefore, I dissent.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, first certified question answered in accordance with the opinion herein and second certified question answered in the negative.  Opinion by Judge Rivera.  Chief Judge DiFiore and Judges Abdus-Salaam, Stein and Fahey concur.  Judge Pigott dissents in part in an opinion. Judge Garcia took no part.


Decided May 3, 2016