Fahey, J.
(dissenting). I respectfully dissent. I would reformulate the first certified question and answer it to say that, under New York common law, both a laboratory and a medical review officer (MRO) owe a duty of care to the subject of a drug test to conduct that procedure in keeping with professional standards. I would also reformulate the second certified question and answer it to say that, under New York common law, a plaintiff may establish the reliance element of a cause of action for fraud by showing that a third party justifiably relied on false statements or omissions of a defendant that were intended to influence the plaintiff.
The First Certified Question
A.
The first certified question asks “whether drug testing regulations and guidelines promulgated by the [Federal Aviation Administration (FAA)] and [Department of Transportation (DOT)] create a duty of care for drug testing laboratories and program administrators under New York negligence law” (Pasternack v Laboratory Corp. of Am. Holdings, 807 F3d 14, 24 [2d Cir 2015]). Before posing that question, in Drake v Laboratory Corp. of Am. Holdings (458 F3d 48 [2d Cir 2006]) the Second Circuit observed that through the Federal Aviation Act (FAAct) “Congress granted the FAA broad authority over aviation safety, including the power to adopt regulations that it ‘finds necessary for safety in air commerce and national security’ ” (Drake, 458 F3d at 56, quoting 49 USC § 44701 [a] [5]). In accordance with that directive, “in 1988, the FAA promulgated regulations mandating that all aviation-industry employees who perform safety-sensitive functions be subjected to random drug-testing” (Drake, 458 F3d at 56). Plaintiff is required to submit to mandatory drug testing pursuant to those regulations, which “incorporate by reference DOT regulations that set out . . . elaborate rules for conducting drug tests” (id. at 56-57). As the majority notes (see majority op at 824-825), those rules underlie this case.
*831 Although its observations are instructive as to the regulatory backdrop to this matter, Drake is more important to my analysis for this conclusion that it drew: “the FAAct does not provide a private right of action for violations of FAA drug-testing regulations” (Drake, 458 F3d at 64). Based on that conclusion, I cannot agree with the majority that the Second Circuit now asks whether the common law of this state imposes upon those responsible for conducting FAA-mandated drug testing a duty to adhere to the regulations that establish the rules for performing such tests {see majority op at 825-826). In my view that question was basically answered through Drake’s determination that there is no private right of action for the breach of an FAA drug testing regulation.
Rather, the essence of the Second Circuit’s query is whether the common law of this state imposes upon those responsible for performing FAA-mandated drug testing a duty to handle such testing with reasonable care. Consequently, to provide appropriate guidance to the parties (see generally Beck Chevrolet Co., Inc. v General Motors LLC, 27 NY3d 379, 389 [2016]), I would reformulate the first certified question to ask:
Whether, under New York common law, entities that either perform an FAA-mandated drug test or review the results of such a test owe a duty of care to the subject of the test to conduct the test or to review the results of the test in keeping with relevant professional standards.[1]
B.
As reformulated, I would answer the first certified question in the affirmative.
*832 In Landon v Kroll Lab. Specialists, Inc. (22 NY3d 1 [2013]) we considered the question whether the plaintiff, who was subject to drug testing conducted by the defendant laboratory on behalf of a county as part of his probation, had stated a cause of action against the laboratory for the alleged negligent testing of his biological sample (see id. at 3). In furtherance of such testing, the plaintiff provided the laboratory with an oral sample, and he obtained an independent blood test as well to protect himself against a false positive. The blood sample “came back negative for illicit and controlled substances,” but the laboratory “detected the presence of cannabinoids in the oral sample” that exceeded a cutoff level of one nanogram (ng) per milliliter (ml) {id. at 4). Consequently, the laboratory generated a written report reflecting that the plaintiff had tested positive for marihuana, which, in turn, caused the county probation department to commence a violation proceeding against the plaintiff based on his alleged breach of the conditions of his probation precluding his use of that drug {see id.).
The violation proceeding eventually was terminated in the plaintiff’s favor, and he subsequently commenced an action against the laboratory based, in relevant part, on the theory that the laboratory negligently issued the report reflecting the positive test result. As alleged in the complaint, the cutoff level recommended by the manufacturer of the device by which the oral fluid was taken from the plaintiff was 3.0 ng/ml, whereas the standards of the United States Department of Health and Human Services Substance Abuse and Mental Health Services Administration (SAMHSA) recommended a cutoff level of 4.0 ng/ml. That is, pursuant to those standards, more than the 1.0 ng/ml of cannabinoids found by the laboratory was required to establish a positive result for that substance. The complaint further alleged that the laboratory ignored New York State Department of Health Laboratory and SAMHSA standards designed to guard against a false positive test result, and that the erroneous test results were the product of the laboratory’s systemic negligence in its substance abuse testing practices {see id. at 4-5).
The laboratory moved to dismiss the complaint pursuant to CPLR 3211 (a) (7) for failure to state a cause of action. We concluded that the complaint was sufficient to withstand the motion (see Landon, 22 NY3d at 3) inasmuch as the plaintiff had alleged that the laboratory “did not exercise reasonable care in the testing of [the] plaintiff’s biological sample when *833 [the laboratory] failed to adhere to professionally accepted testing standards [before] releas [ing] a report finding that [he] had tested positive for THC,” a psychoactive compound in marihuana (id. at 6). We subsequently clarified that the laboratory “had a duty to the [plaintiff] to perform his drug test in keeping with relevant professional standards” (id. at 6-7), which, importantly, was based upon our recognition of the “profound . . . consequences” of “the release of a false positive report” (id. at 6).
Said simply, Landon articulated a duty to act with reasonable care to prevent a false positive drug test result. There the duty applied to the laboratory responsible for the testing of the plaintiffs biological samples inasmuch as the laboratory was “in the best position to prevent false positive results” (id.; see Davis, 26 NY3d at 572 [“A critical consideration in determining whether a duty exists is whether the defendant’s relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm” (internal quotation marks omitted)]).
Here the entities best positioned to prevent what plaintiff claims was essentially a false positive result are defendants, which, respectively, administered plaintiff’s drug test (defendant Laboratory Corporation of America Holdings [LabCorp]) and employed the MRO who certified the results of that examination (defendant ChoicePoint, Inc.). To conclude that defendants owed a duty to plaintiff to prevent the erroneous test result here is not to extend Landon (cf. majority op at 826), but merely to apply to this case its core teaching that those situated similarly to the laboratory there in question have a duty to act with reasonable care to prevent a false positive drug test result.
Defendants contend that this case is distinguishable from Landon in that the actions challenged here resulted in the allegedly negligent reporting of a refusal to test, as opposed to a false positive result in the strictest sense. This is not a rational basis for distinguishing Landon which, in my view, did not restrict the duty of care to “scientific” errors but, rather, more broadly imposed a standard of reasonable care with regard to the testing process and administration. Indeed, a negligent and erroneous determination that a subject refused to test causes the same harm as a false positive. This is clearly evidenced by the circumstances here, in which plaintiff was stripped of his qualifications and, as a result, allegedly lost significant employment.
*834 Consequently, I would answer the first certified question, as reformulated, in the affirmative so as to say that a laboratory and an MRO owe a duty to the subject of a drug test to conduct that test in keeping with relevant professional standards which, in the FAA context, are defined by the regulations governing the drug testing process (see Drake, 458 F3d at 65 [a subject “may seek state-law remedies for violations of the federal regulations, (but) state law cannot enlarg(e) or enhanc(e) the regulations to impose burdens more onerous than those of the federal requirements” (internal quotation marks omitted)]). Contrary to the majority’s assertion, recognition that plaintiff’s claims here fall within the scope of the duty under Landon would not likely result in a proliferation of claims. First, the potential pool of plaintiffs is clearly and easily delineated and identified — namely, the duty runs to the individual test subject, the most obvious third party to be harmed by this type of alleged negligence.[2] Second, to the extent the majority expresses concern that maintaining the Landon duty for violations of regulations other than those governing the “scientific integrity” of the test would open the floodgates (majority op at 826), such concern is also misplaced. To be sure, the regulations governing the testing process and administration are numerous. However, recognition of a duty to complete FAA drug testing with reasonable care, as informed by the regulations, would not relieve a plaintiff of his or her burden to demonstrate that the regulations were actually breached and that the violation of the regulations was causally related to his or her injuries.[3] To that end, true “ministerial” regulations are unlikely to be sufficient to sustain a successful cause of action for negligence.
For the foregoing reasons, I disagree with the majority’s answer to the first certified question.
The Second Certified Question
The second question asks “whether a plaintiff may establish the reliance element of a fraud claim under New York law by *835 showing that a third party relied on a defendant’s false statements resulting in injury to the plaintiff” (Pasternack, 807 F3d at 24). I agree with the majority that, at its core, that question asks “whether third-party reliance can establish the reliance element of a fraud claim” (majority op at 827). To provide appropriate guidance to the parties, I would reformulate the second certified question to ask:
Whether a plaintiff may establish the reliance element of a cause of action for fraud under New York law by showing that a third party relied on a defendant’s false statements resulting in injury to the plaintiff where the statements were made with the intent of influencing the plaintiff and causing injury.
As reformulated, I would answer the second certified question in the affirmative. That is, unlike the majority (cf. majority op at 827, 829), I would conclude that the reliance element of a cause of action for fraud may be established through evidence that a third party relied on the alleged misrepresentation if the misrepresentation was made with the intent of influencing the plaintiff and causing injury.
“The elements of a cause of action for fraud require [1] a material misrepresentation of a fact, [2] knowledge of its falsity, [3] an intent to induce reliance, [4] justifiable reliance by the plaintiff and [5] damages” (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]). At issue is the reliance element, which speaks to the rule that “[t]he reliance must be justifiable in the sense that the party claiming to have been defrauded was justified both in believing the representation and in acting upon it” (2A NY PJI2d 3:20 at 192 [2016]). Inasmuch as “ There can be no liability in fraud where the complaining party is, in advance, fully knowledgeable and apprised of those matters as to which the representations are alleged to have deceived’ ” (First Natl. State Bank of N.J. v Irving Trust Co., 91 AD2d 543, 544 [1st Dept 1982], affd on op below 59 NY2d 991 [1983], quoting 200 E. End Ave. Corp. v General Elec. Co., 5 AD2d 415, 418 [1st Dept 1958], affd 6 NY2d 731 [1959]), “[t]he [relevant] question ... is whether the person claiming to have been deceived ‘knew or had reason to know’ the facts” (2A NY PJI2d 3:20 at 194 [2016], citing Angerosa v White Co., 248 App Div 425 [4th Dept 1936], affd 275 NY 524 [1937]).
*836 There is another key component to the reliance element of a cause of action for fraud. At times we have suggested that the plaintiff, that is, the party claiming to have been defrauded, must have justifiably relied on the material misrepresentation of fact (see e.g. Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011], quoting Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996] for the proposition that, “[generally, in a claim for fraudulent misrepresentation, a plaintiff must allege [, inter alia,] ‘a misrepresentation or a material omission of fact . . . made for the purpose of inducing the other party to rely upon it, [and] justifiable reliance of the other party on the misrepresentation or material omission’ ” [emphasis added]; Eurycleia Partners, LP, 12 NY3d at 659 [“The elements of a cause of action for fraud require . . . justifiable reliance by the plaintiff’ (emphasis added)]). At other times, however, our approach has been vague with respect to the reliance element inasmuch as we have declined to specifically say that it is the plaintiff that must have justifiably relied on the alleged misrepresentation (see e.g. Vermeer Owners v Guterman, 78 NY2d 1114, 1116 [1991]). The issue thus becomes whether a plaintiff may establish the reliance element of a cause of action for fraud where a third party is the recipient of the misstatement or omission. In my view, the reliance element of a cause of action for fraud may be established by showing the reliance of a third party on false statements made by a defendant if it is established that the defendant intended[4] for those statements to influence the plaintiff.
That conclusion — that third-party reliance may support a cause of action for fraud where there is an intent on the part of the defendant that the misrepresentation or omission influence the plaintiff through the proxy of the third party — is compatible with existing case law. It is true that the Appellate Division, First Department, has ruled that a plaintiff “[generally . . . cannot claim reliance on misrepresentations a defendant made to third parties” to establish a cause of action for fraud (Wildenstein v 5H&Co, Inc., 97 AD3d 488, 490 [1st Dept 2012]), *837 and the Fourth Department has taken a similar approach (see Warren v Forest Lawn Cemetery & Mausoleum, 222 AD2d 1059, 1059 [4th Dept 1995] [“Plaintiff is not a proper party to allege fraud because no misrepresentation was made to him, nor did he allege that he relied on any misrepresentation”]). The Second Department has at times taken the same approach (see Garelick v Carmel, 141 AD2d 501, 502 [2d Dept 1988] [“to plead a valid cause of action sounding in fraud, the complaint must set forth all of the elements of fraud including the making of material representations by the defendant to the plaintiff”]), but its jurisprudence also provides that a defendant may be liable for fraud based on false statements made to a governmental agency that result in harm to a third party (see Buxton Mfg. Co. v Valiant Moving & Stor., 239 AD2d 452, 453-454 [2d Dept 1997] [holding that the defendant could be liable for fraud for false statements made to and relied on by the Department of Agriculture (DOA), resulting in injury to plaintiff; the statements at issue caused the DOA to disburse funds that, absent the disputed statements, would have been used to pay the plaintiff’s outstanding claims]; see also Ruffing v Union Carbide Corp., 308 AD2d 526, 528 [2d Dept 2003] [citing Buxton with approval]).
Although the Second Department’s decision in Buxton does not specifically say that the defendant’s false representation to a third party was made with the intent to influence the plaintiff, the “exception” to the normal reliance rule in that case is natural. Buxton’s conclusion that “[f]raud . . . may . . . exist where a false representation is made to a third party, resulting in injury to the plaintiff” (Buxton, 239 AD2d at 454) is based in part on this Court’s decision in Eaton Cole & Burnham Co. v Avery (83 NY 31 [1880]). In Eaton, an action for deceit was supported by allegations of false representations “made [to a mercantile agency] with the intent that they should be communicated to and believed by [the plaintiff, who was] interested in ascertaining the pecuniary responsibility of” another business for the purpose of determining whether to deliver goods to that business (id. at 33).
Eaton was also cited by the First Department in Desser v Schatz (182 AD2d 478 [1st Dept 1992]) for the proposition that the fact “that the false representation was not made directly to [the] plaintiff” was “of no moment” with respect to the allegedly fraudulent representation there at issue (id. at 479-480). So too was Eaton referenced by the Third Department in By *838 num v Keber (135 AD3d 1066, 1068 [3d Dept 2016]), where that Court recognized the third-party reliance doctrine and suggested that a misrepresentation made for the purpose of being communicated to the plaintiff or with the intent of reaching and influencing the plaintiff may support a cause of action for fraud. Moreover, Eaton is consistent with Bruff v Mali (36 NY 200, 206 [1867]), where this Court ruled that “defendants[,] having issued the false certificates of stock authenticated by them as genuine, and cast them upon the market with fraudulent intent, are liable to every holder to whose hands they may come by fair purchase,” and compatible with Rice v Manley (66 NY 82, 87 [1876]), where we said that “[t]he mere forms adopted for the perpetration of frauds are of little importance; it matters not whether the false representations be made to the party injured or to a third party, whose conduct is thus influenced to produce the injury, or whether it be direct or indirect in its consequences.”[5]
Perhaps Prosser said it best:
“while [a] defendant is not required to investigate or otherwise guard against the possibility that his [or her] statements may come into the hands of strangers and affect their conduct, his [or her] responsibility [for those statements] should at least extend to those who might reasonably be expected to assume from appearances that the representation was intended to reach them” (Prosser & Keeton, Torts, § 107 at 745 [5th ed 1984] [emphases added]).
In practice, to reject the third-party reliance doctrine is to facilitate the commission of fraud by straw man and to ease the practice of deceit. Consequently, I respectfully disagree with the majority that a plaintiff cannot meet the reliance element of a cause of action for fraud through a third party’s reliance on a misrepresentation (see majority op at 829). I would reformulate the second certified question and answer it to say that a plaintiff may establish the reliance element of a cause of action for fraud through evidence that a third party relied on the defendant’s alleged misrepresentation if that misrepre *839 sentation was made with the intent of influencing the plaintiff and causing injury.
Chief Judge DiFiore and Judges Pigott and Garcia concur; Judge Stein dissents in part in an opinion; Judge Fahey dissents in an opinion in which Judge Rivera concurs.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in accordance with the opinion herein.

. The recast first certified question omits reference to “drug testing regulations and guidelines promulgated by the FAA and DOT” (Pasternack, 807 F3d at 24) by design. The threshold question of duty — or responsibility — in this instance is one for the courts and turns on an analysis of law (see Davis v South Nassau Communities Hosp., 26 NY3d 563, 572 [2015]; Purdy v Public Adm’r of County of Westchester, 72 NY2d 1, 8 [1988], rearg denied 72 NY2d 953 [1988]), not of regulations and guidelines. Once it is determined that a duty exists, the secondary question whether that responsibility has been breached may be answered by, among other things, evidence of the violation of pertinent rules or regulations (see generally Bauer v Female Academy of Sacred Heart, 97 NY2d 445, 454 [2002]; Elliott v City of New York, 95 NY2d 730, 734 [2001]; Landry v General Motors Corp., Cent. Foundry Div., 210 AD2d 898, 898 [4th Dept 1994]). To that end, in the context of this case the question of compliance with the FAA and DOT regulations and guidelines becomes relevant only if it is determined that defendants owed a duty to plaintiff to properly conduct the drug test.

. While the majority is correct that the primary aim of the drug testing procedures is to ensure the safety of the public, the MRO process is structured, at least in part, to provide safeguards to protect the employee test subject from the consequences of an erroneous result or determination (see Spiker v Sanjivan PLLC, 2013 WL 5200209, *15, 2013 US Dist LEXIS 131985, *34-38 [D Ariz, Sept. 16, 2013, No. CV-13-00334(PHX/GMS)]).

. I express no opinion as to whether the complaint or evidence is sufficient with respect to these elements.

. Fraud, of course, is an intentional tort (see generally Simcuski v Saeli, 44 NY2d 442, 451 [1978]; PJI 3:20) and, as noted, one of its elements is “intent to induce reliance” (Eurycleia Partners, LP, 12 NY3d at 559). It follows that, where a plaintiff alleges that a third party, not the plaintiff, justifiably relied on a material misrepresentation or omission, the plaintiff should be required to establish that the defendant intended for the misrepresentation or omission to influence the plaintiff.

. I take no position with respect to the majority’s belief that “Eaton does not support plaintiff’s claim here” (majority op at 828). In my view, our present task is not to determine whether the law supports plaintiff’s case, but “to provide certainty to and settlement of [this state] law issue [ ]” (Bocre Leasing Corp. v General Motors Corp. [Allison Gas Turbine Div.], 84 NY2d 685, 691 [1995]).